United States District Court
for the District of Connecticut

Michelle Cantatore, et. al.
      Petitioners,

V.               Civil Action No. 3:22-cv-01232-SVN

Warden Timetha Pullen        JURY TRIAL
in her individual and         DEMANDED
official capacity as Warden
of Danbury Prison Camp,
and Bureau of Prisons (BOP), et al.,
      defendants

## Complaint

### I. Jurisdiction
1. This court has jurisdiction over plaintiffs' Federal claims pursuant to 28 U.S.C. §1331 and 1343 (a)(3).

### II. Venue
2. The District Court of Connecticut is an appropriate venue under 28 U.S.C §1391 (b)(2) because the events giving rise to the instant claims occured in this district.

### III. Factual Allegations
The Federal Prison Camp (FPC), located in Danbury, CT, currently houses ninety-plus inmates. This is a minimum

(-1-)

Security facility with dormitories in the basement, and has no fence around its perimeter.

Inmates housed at this facility are classified as "out-custody", thereby affording them the status of "public citizens."

On September 6, 2022, the FPC medical department conducted rapid COVID testing on all of the women housed there due to a positive test result on an inmate who went to sick call earlier that day.

When the test results came back, an additional twelve (12) inmates returned with positive COVID virus results. These thirteen (13) inmates were removed from population and moved in to the FPC visiting room to begin a ten (10) day isolation period.

### Assumptive Cause of Infection of Camp Inmates with the COVID Virus

It is of importance that this court be made aware of the "Super Spreader Event" that is the logically deduced spread of the virus to the women at FPC.

The inmates had no way to individually contract the virus, as we all live in an isolated community - the only

(-2-)

way the virus could have made its way into this, or any other, prison is by the staff members bringing the infection in.

The camp became infected after an event that occured on August 31, 2022. On this date, six (6) days prior to the first positive COVID test results at FPC, the executive staff, along with approximately fifteen (15) other officers, raided the camp, and conducted a shakedown, that lasted approximately two and a half hours, along with a strip search and cavity search of all the women. This search of the premises was allegedly done due to the camp being "dirty / unclean", a perplexing claim, since only a day or two prior to this raid, the camp administrator commented on how clean the camp was. Furthermore, it is even more perplexing why strip searches and cavity searches were performed due to unclean dormitory conditions

The result of this raid was the confiscation of what the executive staff deemed "nuisance contraband" - pillows, extra linen, fans (which were smashed on the road - when the staff knows there is no air conditioning or ventilation at the camp), and extra food (apples, bread, etc.).

The premises search and strip/cavity searches were conducted by staff members who were not wearing ANY PPE (masks, gowns, gloves). All of these staff members,

(-3-)

though, had been working in the two adjacent facilities that were rife with the infection of the COVID virus (FCI and FSL).

This raid was the "Super Spreader Event" that led to the subsequent infection of the COVID virus to the only Danbury, CT facility that was virus-free (FPC), and is suspect to premeditation, as it was (1) based on a frivolous premise - "dirty/unclean quarters", and (2) conducted one week prior to the scheduled inspection/tour of the facility by regional directors.

As previously stated, this claim is not a proven fact, but highly suspect, given the Danbury Prison Administration's proven track record of denying access to its facilities by outside parties.

Plaintiffs refer this court to the visit by Senator Bluenthal and Murphy in January 2022 that were scheduled due to, what they called, a "disturbing disregard" for CDC safety protocol and BOP protocol for quarantine standards. Their top priority was to visit the FPC due to the inhumane conditions that have been reported to the public, and was broadcast on local and national news sites.

When the senators arrived, they were denied access to the

(-4-)

FPC, despite the fact that the FPC tour was at the top of their itinerary. Both senators were outraged, and even tweeted about this "underhanded" action of the FPC Danbury Administration.

These facts prove the dishonest and unreliability of the staff/administrators running the FPC, and the unsafe conditions every person (housed) under their care is subject to.

To return to the present factual allegations, these thirteen (13) initially infected women were moved to the FPC visiting room on September 6, 2022 to begin their ten (10) day isolation/quarantine period. The remainder of the population was placed on a quasi-quarantine status. They were allowed out of their basement dormitories for three (3) hours daily. Nobody was allowed to go to work, education classes, the cafeteria, TV rooms, or the gym.

The women isolated in the visiting room were not given access to phone calls, emails, or any other type of outside communication. Nor were they allowed any time outside. Even an hour of fresh air is alloted to those inmates on death row.

Two days later, on September 8, 2022, another inmate was suffering with COVID symptoms and went to medical

for testing, where she tested positive. This inmate was subsequently moved into the FPC visiting room with the thirteen (13) women who were placed there on September 6, 2022, resulting in a "reset" of the ten (10) day isolation period for them all - a violation of CDC guidelines and BOP quarantine protocol of mixing newly infected persons with those that had already began isolation twenty four (24) hours prior.

Later that same day (September 8, 2022), as this newly infected inmate was placed in the FPC visiting room, the remaining population was tested for COVID. The results came back with an additional eleven (11) women testing positive with the COVID virus.

Initially, these eleven (11) women brought their belongings to move into the FPC visiting room with the now fourteen (14) women there, but there was not enough space to house them there, so they were moved to isolate/quarantine in the camp's upstairs TV room area to begin their ten (10) day isolation period.

Four (4) days later, on September 12, 2022, after one or more of the remaining camp population complained of COVID symptoms, the women were tested once again, resulting in an additional eight (8) testing positive for the COVID virus. These newly infected women were put in a

(-6-)

small TV room while administrative Staff decided where they should be moved to isolate/quarantine.

The total number of women infected with COVID, with the addition of these eight (8) women, was thirty two (32).

Administrative staff then made an unprecedented and clear violation of all guidelines and protocol and decided to combine ALL of the infected women and move them into an empty basement dormitory that was empty because it had recently failed inspection and was deemed uninhabitable

This was an egregious and utter failure of safety protocol by the prison officials to combine those infected on September 6, 8, and now 12. and move them into a condemned and decrepit, uninhabitable, dirty, dungeon-like basement dormitory together; further adding to the utter lack of adherance to the CDC guidelines, and BOP's own protocol. Combining all those infected reset everyone's ten (10) day isolation/quarantine period, now making their start date the 12th of September, despite the original thirteen (13) having been isolated since the 6th of September. They, and all of the others, were now reset back to day one of their ten (10) day isolation/quarantine period.

Five (5) days later, on September 17, 2022, the remaining women in population were once again tested for the COVID

virus after one or more inmates reported suffering COVID symptoms. Five (5) more tested positive after this round of rapid testing, and they were placed right in to the uninhabitable dorm with thirty-two (32) other positive cases, to start their ten (10) day isolation/quarantine period. This, once again, reset all of the other womens' dates, some of which were already well over ten (10) days. To call this a *failure* of safety protocol, CDC guidelines, and just simple common sense doesn't show the truly collos-sal failure and danger these women (myself now included, as I was one of the five (5) women who tested positive on the 17th of September) were placed in.

To this point, plaintiffs have set forth the facts supporting the egregious, inhumane, and substandard care/actions of the warden's staff in the handling of the COVID outbr-eak, and the decisions of the isolation/quarantine placem ent.

Now comes the plaintiff to describe to this court the uninhabitable living quarters the women with COVID have been moved into. Describing the inhumane conditions that are causing more illness and threatening all that are housed there's health and safety.

The basement dormitory (heretoforth referred to as "A-Dorm") that all of the COVID infected women were

moved to on September 17, 2022, was an empty basement dormitory that, several weeks prior, failed inspection for habitation.

Inhumane / Unsafe / Substandard Conditions:

1) A-Dorm meets no standard of safety protocols by the BOP, OSHA, or any institutional protocol standards.

2) The dorm has asbestos tiled ceiling (straw panels) that, once broken, are a danger. Tiles throughout A-Dorm are broken, with pieces hanging down.

3) Paint chips fall constantly from the ceiling and walls on to bunks and floors.

4) Black mold is prevalent in ceiling, on walls, and throughout the entire dorm.

5) Pest infestation: mice, spiders, insects

6) Broken windows and screens

7) No temperature control - extremely cold overnight.

8) Water seepage through cement floors, resulting in puddles, when it rains.

(-9-)

9) Inconsistent medical visits

10) Overcrowding - all bunks were filled when the five (5) COVID positive women were moved in on September 17, 2022. The following day, September 18, one more inmate tested positive and was moved in to A-Dorm. There were no bunks available. Inmates were given a mattress and a cot and told to "figure out" where to put her. The cot would not fit anywhere, so she put the mattress between two bunks, with about four (4) inches separating each bed. This is a clear violation of OSHA. There needs to be thirty-six (36) inches in order for people to walk between to get in and out of the room and to the bathrooms. This is also a violation of BOP policy. In addition to this cot, two others were already set up in a corner of the dormitory due to overcrowding.

11) Ceiling leaks

12) Excessive dust from construction that was never cleaned.

13) Bunks not secured to floor. Wobbly, unstable, unsafe, no upper bunk panels to prevent falling.

14) No outside recreation or fresh air.

15) Continual threat of physical violence (pepper spray,

restraints, placement in SHU) when women ask for fair treatment / safe conditions.

16) Staff not wearing PPE when entering dormitory.

17) No cleaning supplies.

These are the conditions the warden and staff have placed plaintiff(s) under during a period of isolation to recover from the COVID virus; a virus the entire world knows is not to be taken lightly, that changes constantly, and has killed millions of people around the world.

This foregoing factual allegations list is an unfathomable, mind-boggling, extraordinary violation of plaintiffs' 8th Ammendment right to health and safety.

The defendants deliberate indifference to the care, health safety, and legal obligations to follow CDC guidelines as well as their own policies is a gross injustice to all claim-ants herein.

## IV. Ongoing Substantial Risks

The conditions, and actions of the defendants describe herein are ongoing: this is the fourth (4th) quarantine of the camp since 2021, and will undoubtedly occur

again until the COVID virus is no longer identified to have a quarantine containment of its spread in the Bureau of Prisons (BOP).

The conditions are a risk to the health and safety of each person placed into them. The mismanagement of COVID safety guidelines as set forth by the CDC and BOP institutional protocol are egregious, life threatening, substandard, and inhumane.

## Ⅴ. Causes of Action

Plaintiffs housed in A- Dorm and party to this cause of action / complaint against defendants are: Michelle Cantatore (83140-054), Amanda Boyle (76687-067), Denise Hanson (37115-048), Antoinette Pringle (36621-509), Janna Brauddus (17536-028), Corina Fall (03386-049), Melissa Slagton (05905-087), Kim Williams (17155-509), De'Nisha Wilson (51410-509), Terry Lynn Miller (44973-509), Wanda Soel (71256-050), Christina Garcia (87424-054), Karin Breitlauch (01226-509), Shasta-una Blair (01984-138), Savanna Giaccione (25340-052), Danielle Orndorff (18664-084), Alex Samoiloff (12208-070), Terri Miller (11211-068), Katelyn McClure (72328-050), Estella LaLuf (09091-509), Lee Blanchette (46719-509), Kimberly Tompkins (72417-509), Natalie Cassidy (11837-509), Michelle Dailey (65870-060), Danielle Hartley

(56300-509), and Kourtnei Williams (25821-104)

## Count I

The deliberate indifference of Warden Timetha Pullen, in her individual and official capacity of Danbury Prison Camp and the Bureau of Prisons staff to the substantial life threatening harm of the plaintiffs placed in A-Dorm uninhabitably condemned facility in violation of plaintiffs' Eighth Ammendment rights of health and safety

## Count II

Defendant's failure to intervene and provide humane living conditions, medical attention, and CDC quarantine guidelines in violation of plaintiffs' rights under Due Process Clause of the Fourteenth Ammendment to the United States Constitution.

## Count III

The deliberate indifference of defendants in not consistently following the enactment of CARES Act release of inmates to home confinement, an action ordered by previous lawsuit to be followed in the release of any inmate with any underlying condition recognized by the CDC as a heightened risk to life-threatening complications of the COVID virus. (See Martinez-Brooks, 459 F. Supp 3d 411.438 (D.Conn. 2020)) in violation of

plaintiffs' rights under the Due Process Clause of the fourteenth ammendment to the United States Constitution.

## VI. Prayer for Relief

Wherefore, plaintiffs respectfully pray that this court:

1) Declare that the acts and omissions described herein violated plaintiffs' rights under the Constitution and laws of the United States.

2) Enter emergency injunctions ordering defendants Warden Timetha Pullen, in her individual and official capacity as warden of Danbury Prison Camp, and the Bureau of Prisons, their successors, agents, employees, and all persons acting in concert with them to cease and desist with the housing of inmates in the officially deemed "uninhabitable" A-Dorm (which, as of September 23, 2022, officials have changed in the computer system and on all paperwork to be referred to as "D-Dorm"; in an order to cover up the fact that they are housing inmates in that dormitory that failed inspection, and was deemed uninhabitable. This is a deplorable, underhanded blatant act by the prison and its officials to cover up their egregious and inhumane act of housing inmates in that dorm. The act of categorically changing the Sentry Computerized designation from "A-Dorm" to "D-Dorm" makes NO change to the fact of it's uninhabitability - and further proves the unsafe, inhumane, and dishonest

(-14-)

actions of the prison and all its employees towards the inmates charged to their care.)

3) Enter emergency injunctions for the immediate release of all inmates with underlying medical conditions recognized by the CDC as to heighten the susceptibility to life-threatening conditions of the COVID virus. Order the prison to process this immediate release forthwith as done by the Honorable Judge Michael Shea in Martinez-Brooks v. Easter, Dist. of CT wherein the Judge ordered the prison officials to release these vulnerably heightened immediately, to cease their continued delay of process of these releases, and to desist with the qualifier (BOP instituted), that an inmate must have completed fifty (50) percent of their sentence to be granted this release or have eighteen (18) months or less remaining on their sentence after serving twenty-five (25) percent of their sentence. All caveats instituted by the BOP and not part of the national CARES act that Judge Michael Shea's emergency injunction order resulted in the immediate release of dozens of inmates. The same relief is sought herein to be enacted in an immediate and emergency fashion.

4) Enter judgment in favor of plaintiffs for nominal, compensatory, and punitive damages in the amount of twenty-million dollars ($20,000,000), as allowed by law, against each defendant, jointly and severally.

(-15-)

5) Order such additional relief as this court may deem just and proper.

Respectfully submitted this 26th day of September, 2022

Michelle Cantatore

Ms. Michelle Cantatore, et. al.
83140-054    FPC Danbury
33½ Pembroke Road
Danbury, CT 06811